IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| ENESCO GROUP, INC., | ) | Case No. 07-00565 |
| et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Honorable A. Benjamin Goldgar |
| | ) | Hearing Date: March 7, 2007 |
| | ) | Hearing Time: 9:30 a.m. |

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on Wednesday, the 7th day of March, 2007, at the hour of 9:30 a.m., we shall appear before the Honorable A. Benjamin Goldgar, United States Bankruptcy Judge for the Northern District of Illinois, or any Judge sitting in his place and stead, in courtroom 613 of the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, and then and there present the **MOTION FOR EXTENSION OF CHALLENGE PERIOD UNDER FINAL DIP ORDER AND TO AUTHORIZE RULE 2004 EXAMINATIONS, OR IN THE ALTERNATIVE, TO AUTHORIZE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO INITIATE ADVERSARY PROCEEDING ON BEHALF OF THE BANKRUPTCY ESTATES AGAINST PREPETITION LENDERS AND PREPETITION AGENT** (the "Motion"), a copy of which is attached hereto and hereby served upon you.

> HOWARD L. ADELMAN, ESQ. (ARDC #0015458)
> CHAD H. GETTLEMAN, ESQ. (ARDC #944858)
> HENRY B. MERENS, ESQ. (ARDC #6181695)
> BRAD A. BERISH, ESQ (ARDC #06200891)
> ADELMAN & GETTLEMAN, LTD.
> 53 West Jackson Boulevard, Suite 1050
> Chicago, Illinois 60604
> 312/435-1050
> Counsel for Official Committee of Unsecured Creditors

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this Notice of Motion and the Motion referred to therein were served upon the parties listed on the attached service list via the methods set forth on attached list on this 5th day of March, 2007.

74191.2

1

_____ /s/ Brad A. Berish _____

**SERVICE LIST**

**VIA ECF & E-MAIL**

Matthew J. Botica, Esq.
Mindy D. Cohn, Esq.
Daniel J. McGuire, Esq.
Winston & Strawn, LLP
35 W. Wacker Drive
Chicago, IL 60601
mbotica@winston.com
mcohn@winston.com
dmcguire@winston.com

Patrick A. Clisham, Esq.
Allen J. Guon, Esq.
Brian L. Shaw, Esq.
Shaw Gussis Fishman Glantz
   Wolfson & Towbin, LLC
321 N. Clark Street, Suite 800
Chicago, IL 60610
pclisham@shawgussis.com
aguon@shawgussis.com
bshaw100@shawgussis.com

Alex Darey, Esq.
Askounis & Borst, P.C.
180 N. Stetson Avenue, Suite 3400
Chicago, IL 60601
adarcy@askborst.com

Charles J. Filardi, Esq.
Filardi Law Offices, LLC
65 Trumbull Street, 2nd Fl.
New Haven, CT 06510
charles@filardi-law.com

Lawrence V. Gelber, Esq.
Sophie S. Kim, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

lawrence.gelber@srz.com
Sophie.Kim@srz.com

Douglas A. Graham
Exelon Business Services
10 S. Dearborn Street
Chicago, IL 60603
douglas.graham@exeloncorp.com

Fred R. Harbecke
29 S. LaSalle Street
Suite 945
Chicago, IL 60603
fredrharbecke@sbcglobal.net

Christopher J. Lawhorn, Esq.
Bryan Cavel, LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102
cjlawhorn@bryancave.com

Douglas J. Lipke, Esq.
Vedder, Price, Kaufman
   & Kammholz, P.C.
222 N. LaSalle Street
Chicago, IL 60601
dlipke@vedderprice.com

Michael L. Molinaro, Esq.
Stanley F. Orzsula, Esq.
Loeb & Loeb, LLP
321 N. Clark Street
Chicago, IL 6061
mmolinaro@loeb.com
sorszula@loeb.com

Felicia Gerber Perlman, Esq.
Stephen D. Williamson, Esq.
Skadden, Arps, Slate, Meagher

74191.2                           2

& Flom, LLP
333 W. Wacker Drive, Suite 2100
Chicago, IL 60606
fperlman@skadden.com
stwillia@skadden.com

Nancy A. Petermann, Esq.
Greenburg Traurig, LLP
77 W. Wacker Drive, Suite 2500
Chicago, IL 60601
petermann@gtlaw.com

Craig E. Reimer, Esq.
Sajida A Mahdi , Esq.
Mayer, Brown, Rose & Maw, LLP
190 S. LaSalle Street
Chicago, IL 60603
creimer@mayerbrownrowe.com
smahdi@mayerbrownrowe.com

Benjamin L. Schneider, Esq.
Christopher Combest, Esq.
Quarles & Brady
500 W. Madison, Suite 3700
Chicago, IL 60661
bschneid@quarles.com
ccombest@quarles.com

Jolene M. Wise, Esq.
Senior Attorney
Office of Enforcement No. 6 Branch of
Reorganization US SEC
175 W. Jackson Blvd., #900
Chicago, IL 60611
wisej@sec.gov

Richard S. Lauter, Esq.
Levenfeld Pearlstein, LLC
2 North LaSalle Street
Suite 1300
Chicago, IL 60602
rlauter@lplegal.com

James E. Morgan, Esq.
Much, Shelist, Freed, Denenberg
  Ament & Rubenstein, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
jmorgan@muchshelist.com

Ronald Peterson, Esq.
Jenner & Block
One IBM Plaza 38th Fl
Chicago, IL 60611
rpeterson@jenner.com

Gregg Szilagyi, Esq
Levenfeld Pearlstein LLC
Two North LaSalle Street
Suite 1300
Chicago, IL 60602
gszilagyi@lplegal.com

**VIA E-MAIL**
Brian Yeh
1110 Codorniz Lane
Walnut Creek, CA 94598
byeh1@yahoo.com

Alec M. Lipkind
Disney Enterprises, Inc.
77 W. 66th Street
New York, NY 10023
alec.lipkind@disney.com

Patrick J. Trostle, Esq.
Kurt A. Mayr, Esq.
Bingham McCutchen LLP
One State Street, 22nd Fl.
Hartford, CT 06103-3178
patrick.trostle@bingham.com
kurt.mayr@bingham.com

Richard A. Chesley, Esq.
Paul, Hastings, Janofsky & Walker, LLP
191 N. Wacker Drive, 30th Fl.

74191.2

3

Chicago, IL 60606
richardchesley@paulhastings.com

Daniel C. McElhinney
Bankruptcy Services, LLC
757 Third Ave., Third Floor
New York, NY 10017
dmcelhinney@epiqsystems.com

Elizabeth Weller, Esq.
Linebarger Goggan Blair
 & Sampson, LLP
2323 Bryan Street, Suite 1600
Dallas, TS 75201
dallas.bankruptcy@publicans.com

Anne-Lee Verville
avervill@bellsouth.net

PO Box 475
Jefferson City, MO 65105-0475

Mildred (Fran) Durden
25 Clarks Chapel Ext
Weaverville,NC 28787

Thomas Bradley
209 S. Evergreen Ave.
Arlington Heights, IL 60005

Paula Manley
1609 Darien Club Drive
Darien, IL 60561

**VIA OVERNIGHT MAIL**

AmericasMart Real Estate, LLC
c/o Wiles and Wiles - VWN
800 Kennesaw Avenue, Suite 400
Marietta, GA 30060

Malcolm S. Graham
Largo Del Olglata 15, Isola 77, Villino 9/4
00123 Rome, Italy

Douglas Lundberg
471 South 1300 East
Salt Lake City, UT 84102

Mesirow Financial
321 N. Clark Street
Chicago, IL 60610

Steven A. Ginther, Esq.
Special Assistant Attorney General
Missouri Department of Revenue
General Counsel's Office
301 W. High Street, Room 670

74191.2

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| ENESCO GROUP, INC., | ) | Case No. 07-00565 |
| et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Honorable A. Benjamin Goldgar |
| | ) | Hearing Date: March 7, 2007 |
| | ) | Hearing Time: 9:30 a.m. |

## MOTION FOR EXTENSION OF CHALLENGE PERIOD UNDER FINAL DIP ORDER AND TO AUTHORIZE RULE 2004 EXAMINATIONS, OR IN THE ALTERNATIVE, TO AUTHORIZE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO INITIATE ADVERSARY PROCEEDING ON BEHALF OF THE BANKRUPTCY ESTATES AGAINST PREPETITION LENDERS AND PREPETITION AGENT

TO:    THE HONORABLE A. BENJAMIN GOLDGAR,
U.S. BANKRUPTCY JUDGE:

NOW COMES the Official Committee of Unsecured Creditors (the **"Committee"**) of

Enesco Group, Inc. (**"Enesco"**), et al. (collectively, the **"Debtors"**), and for its Motion for

Extension of Challenge Period under Final DIP Order and to Authorize Rule 2004 examinations,

or in the Alternative, to Authorize the Committee to Initiate Adversary Proceeding on Behalf of

the Bankruptcy Estates (**"Estates"**) Against the Prepetition Lenders and the Prepetition Agent

(the **"Motion"**), pursuant to Fed.R.Bankr.P. (the **"Rule(s)"**) 2004 and 9006(b)(1), respectfully

states as follows:

## I. **INTRODUCTION**[1]

By this Motion, the Committee seeks an additional sixty (60) day extension of the initial

Challenge Period established by the Final DIP Order entered in these Cases, within which to

investigate the liens and claims of, or against, the Prepetition Lenders and Prepetition Agent.  As

detailed below, these Cases have moved on an incredibly expedited basis resulting in, among

other things: (a) the payment in full of the Prepetition Lenders' claims within the first 8 days of

these Cases; (b) the Sale of the vast majority of the Debtors' assets within the first 33 days of

these Cases; and (c) the filing of the Debtors' bankruptcy schedules and statement of financial

affairs approximately 4 days ago.  While the asset sale was a great success for the Estates and

supported by the Committee, the exigent circumstances and nuances of the Sale required the

Committee and its professionals to invest a tremendous amount of time and services to determine

if the Sale was in the best interests of the unsecured creditors.  At the same time, since the

Debtors released the Prepetition Lenders as part of the Interim DIP Order, the Committee was

further charged with the responsibility to investigate the liens and claims of the Prepetition

Lenders also within a very limited period of time.

As detailed below, the Committee's investigation has become much more complicated as

numerous issues have arisen which require further scrutiny.  In addition, this investigation has

been hampered and complicated by the fact that after only one week of the Committee's

formation, one of the Prepetition Lenders objected to the Committee's chosen counsel which,

after failed negotiations over the following week, resulted in the Committee's counsel resigning

---

[1]     Capitalized terms not defined in the Introduction shall have the meaning set forth
in the body of this Motion.

and new counsel being retained only one day before the initial final hearing on the DIP Motion and a little over before the Sale Hearing was held.

Rule 9006(b)(1) is liberal in its construction and permits extensions of deadlines, such as the Challenge Period, to be granted merely "for cause" shown. The Committee believes that in view of the particular circumstances of these proceedings, its diligent efforts to date, the numerous issues discovered, and the further investigation needed, the Committee's requested sixty (60) day extension of the Challenge Period is both reasonable and warranted.

In addition, as detailed below, the Committee also requests that it be authorized to conduct Rule 2004 examinations of the Debtors, their former employees or other representatives, the Prepetition Lenders and Prepetition Agent, and others, if necessary, in connection with its investigation of the liens and claims of, or against, the Prepetition Lenders and the Prepetition Agent.

In the alternative, the Committee requests authority to commence an adversary proceeding on behalf of the Estates against the Prepetition Lenders and Prepetition Agent instanter to pursue those causes of action arising out of the issues and facts uncovered thus far and described below.

## II.    PERTINENT FACTS

### A.    Sale Motion, DIP Motion, and Establishment of Challenge Period

1.    On January 12, 2007 (the "**Filing Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "**Cases**"). Subsequent thereto, the Debtors have continued to operate their businesses and manage their affairs as debtors in possession under the supervision of this Court. The individual members of the Committee were appointed

by the United States Trustee in these Cases on January 19, 2007.

      2.      No trustee has been appointed in these Cases.

      3.      Within one week of the filing of the Cases, the Debtors filed a motion for the establishment of bidding procedures and a sale hearing ("**Sale Hearing**") for the sale (the "**Sale**") of substantially all of the Debtors' assets as a going concern [docket no. 40] (the "**Sale Motion**"). The Sale Motion proposed Tinicum Capital Partners II, LP ("**Purchaser**") as the "stalking horse" bidder for the Sale pursuant to the terms of a purchase agreement (the "**APA**") that was attached to the Sale Motion.

      4.      As detailed in the Sale Motion: (a) Enesco was a leader in the design, manufacturing and marketing of licensed and proprietary branded giftware, and home and garden decor products to a variety of specialty gift, home decor, mass market and direct mail retailers; (b) Enesco sold its products in approximately 25 countries around the world; (c) Enesco maintained its principal executive offices in Itasca, Illinois and conducted its global business through its eight active wholly-owned subsidiaries (the "**Subsidiaries**") and affiliated corporations, including two Subsidiaries in the United States, both of which are Debtors, and six non-Debtor Subsidiaries in Canada, the United Kingdom, France, and Hong Kong; (d) the Debtors employed approximately 785 employees worldwide, 271 of whom worked in US facilities; (e) for the quarter ended September 30, 2006, the Debtors had consolidated net revenues of $50.8 million and for the year ended December 31, 2005, the Debtors had consolidated net revenues of $244.4 million; (f) the principal pre-petition secured obligations for funded debt on Enesco's balance sheet are obligations outstanding under the Second Amended and Restated Senior Revolving Credit Agreement dated as of June 16, 2003, as amended (the

"**Prepetition Credit Agreement**", and along with all other loan, security, and guaranty agreements relating thereto (collectively, the "**Prepetition Loan Documents**")), among Enesco, Bank of America, N.A., as administrative agent (the "**Prepetition Agent**") and the lenders party thereto including LaSalle Bank National Association ("**LaSalle**") (collectively, the "**Prepetition Lenders**"); (g) all such pre-petition which obligations were allegedly guaranteed by the Subsidiary Debtors and secured by alleged liens on substantially all of the Debtors' assets, an alleged pledge of the capital stock of the foreign Subsidiaries, and alleged liens on the foreign Subsidiaries' assets up to a certain percentage of the obligations outstanding under the Prepetition Credit Agreement (the "**Prepetition Liens**"); and (h) as of the Filing Date, the alleged obligations outstanding under the Prepetition Credit Agreement totaled approximately $56 million (the "**Prepetition Debt**").

5.    In conjunction with the Sale Motion and the Sale, Purchaser had also agreed to provide postpetition financing to fund the Debtors' operations during the Sale process, which funding essentially consisted of paying off the Prepetition Debt in full.  In conjunction therewith and commensurate with the filing of the Sale Motion, the Debtors filed a Motion for Interim and Final Orders authorizing, *inter alia*, the Debtors to incur postpetition secured indebtedness [docket no. 45](the "**DIP Motion**").  Pursuant to the DIP Motion, (a) the Prepetition Lenders were unwilling to consent to the use of cash collateral unless the Debtors were pursuing an orderly liquidation; (b) the Purchaser was willing to move forward with the Sale under the APA and to fund the Debtors' operations during the Sale process if that funding was on a senior secured basis and the Prepetition Lenders were willing to accept a discount of up to $3.5 million on a complete payoff of all obligations owing them under the Prepetition Credit Agreement, and

accordingly, (c) the Debtors requested, *inter alia*, authority to obtain secured postpetition

financing from the Purchaser of up to $65 million to fund the ongoing working capital needs of

the Debtors and repay the sums owed to the Prepetition Lenders (the "**DIP Loan**").

6.     The bid procedures for the Sale Motion were approved on January 22, 2007, and

the Sale Hearing was scheduled for February 15, 2007, with objections due by February 12,

2007.  The DIP Motion was also approved on an interim basis on January 22, 2007 [docket no.

73](the "**Interim DIP Order**"), and was set for a final hearing on February 7, 2007, with

objections thereto due by February 2, 2007.   Under the Interim DIP Order, a time period was

fixed within which the Committee could challenge, *inter alia*, the Prepetition Liens, the propriety

of the repayment of the prepayment of the Prepetition Debt, the releases granted in the Interim

DIP Order by the Debtors in favor of the Prepetition Agent and Prepetition Lenders, or any other

cause of action against the Prepetition Agent or the Prepetition Lenders (including by setoff,

counterclaim, or defense to the Prepetition Debt, including but not limited to, those under §§506,

544, 547, 548, 550 and/or 552 of the Code), within thirty (30) days following the date of the

appointment of the Committee in the Cases (the "**Challenge Period**").   In addition, pursuant to

the Interim DIP Order and according to the Debtors, the Prepetition Debt, which totaled

$53,997,656.38 ("**Total Prepetition Debt**"), was paid in full by the DIP Loan on January 23,

2007 (the "**Repayment Date**") in the amount of $52,031,579.99, after deducting for an agreed

upon voluntary discount taken by the Prepetition Lenders totaling $1,966,076.39.  Finally, under

the Interim DIP Order, and as also was approved in the subsequent Final DIP Order, the

Prepetition Agent received $1.75 million out of the proceeds from the Sale which it holds as

security for any "Continuing Indemnification Obligations" (as defined in the Final DIP Order)

arising under the Prepetition Loan Documents including, without limitation, any fees and costs it

incurs in connection with any investigations of its liens and claims by the Committee or any

lawsuit filed against it within the Challenge Period (the "**Prepetition Indemnity Account**").

(See para. 34 of Exh. A to Final DIP Order attached hereto as Exhibit A).

### B.   Committee Involvement in Cases and Investigation Efforts to Date

7.      With the United States Trustee's office working as quickly as it could under the

circumstances, it was still a mere three (3) days before the foregoing described initial Sale

Motion and DIP Motion hearings, that the Committee was appointed by the United States Trustee

on January 19, 2007.  Following the appointment of the Committee, the firm of Greenberg

Traurig, LLP ("**GT**") was selected as proposed counsel to the Committee and immediately began

to render services in that regard.  GT thereafter embarked upon a concerted effort to review the

Sale Motion, the DIP Motion and the numerous other motions filed during the first days of the

Cases.

8.      However, on or about January 23, 2007, GT was contacted by counsel for one of

the Prepetition Lenders, LaSalle, who indicated that LaSalle would seek to disqualify GT as

counsel to the Committee if GT moved forward with its representation of the Committee based

upon GT's representation of LaSalle in unrelated matters.  Following LaSalle's communications

with GT about the alleged conflict, GT attempted to work through those issues with LaSalle

during the following week.  Those negotiations, however, were unsuccessful, and on February 5,

2007, the Committee was advised by GT that although it did not believe that a conflict of interest

existed, for business reasons and in order to avoid impacting the Cases with an unnecessary

retention dispute, GT would not be able to continue as Committee counsel.

9.      In that three week time span during GT's involvement, GT had invested approximately 167 hours, utilizing up to six different attorneys in the Cases representing the Committee in numerous matters including approximately 30 hours relative to a review of certain of the Prepetition Credit Agreements turned over by the Prepetition Agent and the commencement and review of certain lien searches performed in connection with certain of the Prepetition Liens. Despite such effort, there remained significant work to be performed in light of the complexities of the Debtors' affairs and finances.

10.     The Committee immediately interviewed other prospective counsel, and late on February 6, 2007, retained the law firm of Adelman & Gettleman, Ltd. ("**A&G**"), to represent it as counsel in connection with the Cases. At that point in time, several important hearings and deadlines were fast approaching. As stated, the final hearing on the DIP Motion was the next day on February 7th, the deadline for objecting to the Sale was on February 12th, and the Sale Hearing was on February 15th. A&G had quite a task to catch up on all of the matters in the Cases in general, review the other pleadings that had been filed, review the pending motions previously filed by GT that were also set for hearing on February 12th, and review and understand the terms of the DIP Motion and proposed Order relative to same. Under the circumstances, at A&G's request, the Debtors and Purchaser agreed to continue the final hearing on the DIP Motion from Wednesday, February 7th until Monday, February 12th. Ultimately, following the negotiation of certain key revisions by the Committee and its new counsel, the Interim DIP Order became final at the continued hearing on February 12th (the "**Final DIP Order**"). A copy of the Final DIP Order (with only exhibit A attached thereto and without the other referenced exhibits) is attached hereto as **Exhibit A** and by express reference made a part hereof.

11.    Under these same compacted time constraints, A&G also had to try to understand
and determine the benefits and concerns resulting from the Sale for all of the unsecured creditors.
While many of the unsecured creditors were holding claims which were to be assumed as part of
the Sale, there nonetheless remained a significant amount of unsecured debt which was not being
assumed and for which the Committee retained a responsibility to protect as best as possible.
Between its initial retention late on February 6th and the Sale Hearing on February 15th, A&G
incurred more than 165 (est.) hours addressing this and the other matters described in paragraph
10 above.  During that time, the Committee believes that, with the assistance of both A&G and
its financial consultants, Morris-Anderson & Associates, Ltd. (**"M-A"**), it both determined and
resolved its concerns and issues relative to the Sale Motion by successfully negotiating with the
Purchaser for significant additional concessions from the Purchaser in favor of the unsecured
creditors in these Cases, including, among other things, the provision for an additional several
hundred thousand dollars added to the wind-down fund (the "**Wind-down Fund**") that the
Purchaser was to leave behind for the Debtors at closing, and the assumption by the Purchaser of
several million dollars of additional unsecured claims under the terms of the APA.  As a result,
the Committee was able to support the Sale, which was approved by the Court at the Sale
Hearing and which closed by the next day (the "**Closing**").  According to the Debtors, the
consideration paid at Closing by the Purchaser for the Debtors' assets totaled approximately $55
million (the "**Purchase Price**") representing the Purchaser's credit bid of its outstanding DIP
Loan that had been utilized to pay the Prepetition Debt of approximately $52 million, plus the
turnover of the Wind-down Fund and the assumption of certain administrative expenses.  In
addition, under the terms of the APA, the Purchaser assumed the majority of unsecured claims in

the Cases totaling in excess of $18.1 million.  According to the M-A's preliminary review of the

Debtors records, after deducting the assumed liabilities under the APA, after the Sale there may

remain in excess of $5 million of unsecured priority and nonpriority claims in these Cases.

12.     At the time of A&G's retention, it was obvious to the Committee that it would be

virtually impossible to complete the remaining investigation of the Prepetition Agent and the

Prepetition Lender given that (a) the Challenge Period was to end on February 19th under the

Interim DIP Order and (b) it's new counsel would be inundated trying to address the impending

and significant matters discussed above.  As a result, on or about February 8th, A&G requested

that the Prepetition Agent agree to extend the Challenge Period for an additional sixty days.  The

Prepetition Agent refused, but did thereafter agree to enlarge the Challenge Period proposed in

the final DIP Order by two weeks to March 5th.[2]

13.     Since its retention, and especially since the Sale closed, A&G has since embarked

upon a comprehensive examination of the liens and claims purportedly held by the Prepetition

Lenders, which has proven to be a mammoth task. A&G's review began with an examination of

the hundreds of pages of loan documents that GT had received from the Prepetition Agent and

the lien and UCC searches that GT had previously performed or received.  A&G soon discovered

that there had been numerous credit agreements and modifications thereto, a series of promissory

---

[2]     Previously, the Court at the February 7th hearing on the DIP Motion had told the
parties that it would not entertain new objections to the Interim DIP Order from the Committee,
despite its retention of new counsel, because the objection deadline had passed on February 2nd
without any objections having been filed.  Faced with that instruction from the Court, not
actually knowing how long an investigation may take, and believing that it could later seek an
extension of the Challenge Period as permitted under Rule 9006(b)(1) as explained below, the
Committee ultimately accepted and did not oppose the Challenge Period ending on March 5th that
was proposed by the Prepetition Agent - which was incorporated into the Final DIP Order (see
para. 8(b) of Exh. A hereto).

74408.1 3/5/07                        10

notes and guaranties, and multiple security agreements and pledge agreements entered into over

the past 3 1/2 years between not only Enesco, but also its Subsidiaries - both foreign and

domestic. It also became apparent during the course of A&G's review that many loan documents

were missing from those provided to the Committee, certain lien searches were still needed,

numerous legal issues existed, and A&G would have to conduct a series of interviews of key

former personnel of the Debtors in order to understand the relations between the Debtors and the

Prepetition Agent and Prepetition Lenders. A&G's efforts have been further complicated by the

fact that the Debtors (a) had only one employee remaining following the Sale, and (b) had not

filed their schedules (not due until 2/28/07) which may have yielded some helpful information.

A&G and M-A immediately began contacting the Debtors' counsel and the Prepetition Agents'

counsel requesting information and interviews, which requests were thereafter responded to later

in the week of February 19-23. Responses to those requests received by the Committee's

representatives led to follow-up requests made to counsel for the Debtors' and the Prepetition

Agent's counsel on Thursday and Friday February 22nd and 23rd. Those requests were followed

by responses received by the following week between Monday - Wednesday, February 26th-28th,

and then follow-up requests by the Committee's counsel made on March 2nd. Among the

information requested, received, and/or reviewed, during this time frame, or sought from other

sources, includes the following:

> (a)    the names and contact information of all CFOs, General Counsel and certain
> Board Members of Enesco who were in place during the entire loan relationship, and who
> may be able to shed light on the relations and transactions with the Prepetition Lenders
> and Prepetition Agent;
> (b)    financial statements for the Debtors and their Subsidiaries;
> (c)    perfection information relative to certain assets allegedly subject to security
> interests under the Prepetition Loan Documents including copyrights, stock certificates,
> and real estate;

(d)     lien searches relative to perfection of copyrights and certain other intellectual property;

(e)     hundreds of pages of 10Ks, 10Qs, and 8Ks filed since 1/1/03 by the Debtors with the U.S. Securities and Exchange Commission ("SEC");

(f)     information relative to the Purchase Price paid at the Closing, the pay-off of the Prepetition Debt, a detailed listing of all fees not applied to the loan balance that were paid by the Debtors to the Prepetition Agent since 6/1/03;

(g)     numerous promissory notes, security agreements, guaranties, mortgages and amendments to the Prepetition Credit Agreements;

(h)     an aging of payables of the Debtors dating back 3 years;

(i)     valuations or appraisals relative to the Debtors and their Subsidiaries' businesses and assets;

(j)     information relative to loans, if any, to each of the Subsidiaries; and

(k)     information relative to daily loan advances, payments, and balances, as well as borrowing base certificates, concerning the preference period.

14.     The Committee's investigation also entailed the consideration of multiple legal issues, some of which are ongoing, including (a) how to perfect liens in certain assets including, without limitation, copyrights and other intellectual property, leasehold interests, and stock in foreign entities, (b) various aspects of potential fraudulent transfer claims, (c) various aspects of potential preference claims, (d) issues relative to lapsing of UCC filings for merged debtors, and (e) issues relative to this motion including Rule 9006(b)(1) and law relative to section IV of this Motion for authority to bring a cause of action on behalf of the bankruptcy estates.

15.     The Committee's counsel, A&G, has already incurred more than 115 (est.) hours in this investigation (on top of the nearly 30 hours spent by its prior counsel, GT, before they resigned) in order to diligently try to abide by the short time line established by the Challenge Period under the Final DIP Order.

16.     Currently, the Committee is waiting for responses to additional requests for information from the Debtors and the Prepetition Agent including (a) an aging of accounts payables of the Debtors from 1/04 to the Filing Date, (b) all bank statements or other reports

showing all daily loan advances, payments, and balances from 10/1/06-1/12/07, (d) information

relative to any loans made directly to any of Enesco's Subsidiaries from 6/1/05 to date, and (e)

any valuations or appraisals of the Debtors or their Subsidiaries relevant to the time periods from

11/1/04 - 1/12/07.

17.     In addition, although the Committee's professionals have been able to conduct

informal interviews with the Debtor's current CFO, a former General Counsel, and a current

Board Member, these individuals either did not work for the entire 6 1/2 year relationship with

the Prepetition Lenders and Prepetition Agent, or these interviews have revealed other

individuals who need to be interviewed.  The Committee has tried contacting these other

individuals, but has not been able to interview them as yet.  These individuals include Mildred

Durden (former General Counsel 1/18/99-4/1/05), Thomas Bradley (former CFO 1/6/03-

11/16/04), Paula Manley (former CFO 1/24/05-7/15/05), Anne-Lee Verville (former Chairman of

Board for past six years), and Chuck Sanders (former Treasurer for past 6 years, now working for

Purchaser).

18.     Among the issues or facts discovered by the Committee thus far and for which the

Committee would like to continue to investigate rather than commence litigation at this time,

include the following:

(a)     According to public filings with the SEC and/or the Prepetition Loan Documents,
(i) the Debtors began losing money consistently in early 2004 on a consolidated basis and
covenant defaults began occurring under the Prepetition Loan Documents on a consistent
basis resulting in no less than 13 loan amendments to forbear or modify such covenants
beginning at least in the third quarter of 2004; (ii) it was not until after November 2004
that the Prepetition Agent received its first security interest of any kind in assets of the
Debtors which included only inventory and receivables of Enesco along with certain real
estate; (iii) in mid-2005 certain Subsidiaries became borrowers or guarantors, for the first
time, pledging inventory and receivables, however, it is not clear if those Subsidiaries
actually received the benefits of any of the loan proceeds; (iv) in June 2006, the Debtors

received a notice of delisting from the New York Stock Exchange ("**NYSE**") and its stock was promptly pulled from trading on the NYSE by Enesco, and also a default notice from the Prepetition Agent was received concerning loans that exceeded its borrowing capacity under the Prepetition Credit Agreements; and (v) in or about July or August, 2006, the Prepetition Agent received security interests in virtually all of the remaining assets of Enesco, including a pledge of stock of its Subsidiaries, and certain or all of its Subsidiaries' remaining assets. All of these facts have bearing upon the issues or facts discussed below.

(b)     According to public filings with the SEC and/or the Prepetition Loan Documents and lien searches conducted, Enesco owned numerous copyrights that may be essential to its business that were pledged as collateral to the Prepetition Agent, however, those security interests were never perfected. It is not clear what value is attributable to these copyrights. According to public filings with the SEC, the foreign Subsidiaries were consistently profitable entities while Enesco and its U.S. operations were consistently not profitable entities since January 2004. However, it is not clear at this time under applicable law, whether the stock pledges to the Prepetition Agent in the Foreign Subsidiaries were properly perfected. According to the APA, the Debtors sold numerous interests in real estate leasehold interests to the Purchaser, however, it is not clear what the value those interests hold, nor is it clear whether the Prepetition Agent held perfected liens in those assets. If the foregoing described assets were unperfected and represent a significant portion of the Purchase Price of $55 million (est.), and presuming the Purchase Price is indicative of the value of the collateral of the Prepetition Agent, then the Prepetition Agent may have been undersecured when it received payment in full of the Total Prepetition Debt ($54 million (est.)) on the Repayment Date. Thus, more information is needed relevant to the value of these assets and the perfected nature of these assets, which information has been requested or is sought as detailed in paragraphs 14, 16, and 17 above.

(c)     According to the Prepetition Agent and the Prepetition Loan Documents, between April 2005 and the Filing Date, the Debtors paid more than $7.2 million in fees to the Prepetition Agent and/or Prepetition Lenders related to the Prepetition Credit Agreements, which fees were not applied to reduce the Prepetition Debt. Accordingly, the payment of these fees would be fraudulent transfers _if_ paid at a time when the Debtors were insolvent or otherwise were not paying their debts as they came due and _if_ the Debtors did not receive reasonably equivalent value in return for the fees. More information relevant to these issues is being sought as detailed in paragraphs 14, 16, and 17 above.

(d)     According to public filings with the SEC, the Prepetition Debt had a balance of in excess of $63.5 million on November 30, 2006 - within the ninety (90) day period prior to the Filing Date. As stated, however, the Prepetition Debt as of the Repayment Date was down to $54 million (est). Accordingly, if the Debtors were undersecured at the time of the paydown of the Prepetition Debt during the preference period, those payments may

constitute preferential transfers.  Accordingly, more information is needed relevant to the value of the Prepetition Agent's collateral during the preference period and whether and when the Prepetition Debt balance had been higher than $63.5 million during the preference period, which information is still being sought as described in paragraphs 14, 16, and 17 above.

(e)     Finally, as stated, the Committee has still not been able to reach all of the individuals which, it has been informed, worked for or represented the Debtors during the entire 6 1/2 year relation with the Prepetition Agent and Lenders, to determine if other issues or causes of action may exist on behalf of these Estates.

19.     Recognizing the significance of the issues or facts discovered, the need for more information to try to analyze these issues or discover if other issues exist, and in order to avoid protracted and expensive litigation, the Committee realized that an extension of the Challenge Period was necessary and reasonable, and on Monday, February 26th, counsel for the Committee contacted counsel for the Prepetition Agent and requested that the Challenge Period be extended. On Tuesday February 27th, counsel for the Prepetition Agent responded that the Prepetition Agent would not agree to any extension of the Challenge Period.

## III.  REQUEST FOR EXTENSION OF CHALLENGE PERIOD AND 2004 DISCOVERY

### A.     Extension of Challenge Period

20.     As stated, the Committee requests a sixty (60) day extension of the Challenge Period to May 7, 2007.

21.     Rule 9006(b)(1) provides the standard for such relief and states in pertinent part as follows:

"[w]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request therefore is made before the expiration of the period originally prescribed." (Emphasis added).

74408.1 3/5/07                                    15

While "cause shown" is not described in the Rule, "courts should be liberal in granting

extensions of time sought before the period has elapsed, as long as the moving party has not been

guilty of negligence or bad faith and the privilege of extensions has not been abused." 10 Collier

on Bankruptcy §9006.06(3) (15th ed. Rev. 2006). "Rule 9006(b) uses the broad standard of

'cause' in allowing extensions of time when the extension is requested before the applicable

deadline has expired. The rule deliberately uses the distinctly different and somewhat narrower

standard of 'excusable neglect' when the extension is requested after the deadline has expired....

The statutory term 'cause' gives the bankruptcy court the widest possible discretion." In re

Heartland Steel, Inc., 2003 WL 23100035, pg. 3 (S.D.Ind. Dec. 16, 2003) (See **Exhibit B**

attached hereto).

22.     The Committee filed this Motion within the Challenge Period deadline and

accordingly, the above described liberal "for cause" standard applies. As detailed above and

summarized below, the Committee clearly "has not been guilty of negligence and bad faith and

the privilege of extensions has not been abused." Therefore, there is clearly "cause" to grant this

extension:

a.     Rule 9006(b)(1) Applies to Deadlines in Court Orders - As stated, the "cause"
standard under Rule 9006(b)(1) applies with equal force to deadlines fixed in Court
Orders, as it does to deadlines fixed by the Rules. Accordingly, it makes no difference
that the Challenge Period was fixed by an Order of Court which was not objected to by
the Committee, because Rule 9006(b)(1) allows for such deadline to be extended for
"cause".

b.     "Cause" is Clearly Shown Here - There is no evidence that the Committee
dragged its feet in this investigation. To the contrary, the Committee counsel expended in
excess of 115 hours (exclusive of the numerous hours expended by the Committee's prior
counsel (30 hours) and its financial consultants (10-20 hours est.)) already in this
investigation. The Committee did not know ahead of time the scope or nature of the loan
documents involved, the time frame of the loan, or the issues that it would uncover as
detailed above in para. 13-18. As detailed above in paragraphs13 and 17, the Committee

74408.1 3/5/07                                   16

has reviewed numerous documents, lien searches, SEC filings, and conducted several interviews. But, as also stated above in paragraphs 16-18, there are still numerous issues that have been discovered including, without limitation, the huge fees paid by the Debtors to the Prepetition Agent that only lead to more investigation that is needed concerning the perfection status of certain assets, the value of certain assets, and the whether the Debtors were insolvent or unable to pay debts as they came due at that time, or whether the Prepetition Agent was undersecured. Furthermore, although the Committee has tried to contact all of the apparently relevant individuals with knowledge of the relations with the Prepetition Agent, it has been unable to conduct interviews of several individuals as described in para. 17 above.

c. <u>The GT/Prepetition Lender Conflict Issue Hindered the Committee's Investigation Efforts</u> - As stated, within a week after GT's retention by the Committee, LaSalle objected to its retention asserting the existence of a conflict, which GT has always denied existed. Although GT tried to resolve the issue with LaSalle and continue to assist the Committee, it elected to withdraw about ten days later after determining that the issue could not be resolved with LaSalle and a conflict dispute would only detract from the Committee's duties. As stated, the Committee immediately thereafter retained the A&G firm, who had to expend significant efforts to get up to speed and assist in the impending February 15th Sale and other issues which then needed immediate attention. However, this switch in the Committee's counsel that resulted from the GT/LaSalle conflict issue clearly delayed the Committee's investigation efforts. While this may not have likely been LaSalle's moti.

d. <u>Prejudice to the Parties</u> - There is no prejudice to the Prepetition Agent and Prepetition Lenders if this extension is granted other than that they will not know for another 30 days whether an adversary proceeding will be filed. Indeed, if the extension is not granted, a lawsuit will be filed as detailed in section IV below and certainly that action cannot be good news for the Prepetition Agent and Lenders. Moreover, the Prepetition Agent and Prepetition Lenders continue to be protected by the $1.75 million Prepetition Indemnity Account for any fees or costs that they may incur relating to this investigation. On the other hand, there is extreme prejudice to the creditors in these Cases if no extension is granted because then they are deprived of an adequate investigation of potential claims and are forced to incur the time and expense to commence an adversary proceeding that otherwise might be avoided with further investigation of, or communications with, the Prepetition Agent and Prepetition Lenders.

23. Accordingly, for the foregoing reasons the Committee requests that the Challenge Period be extended approximately sixty (60) days to and including May 7, 2007.

**B.** **Request For 2004 Examinations**

24. The Committee seeks leave of the Court to conduct Rule 2004 examinations of

the Debtors, the Prepetition Agent, the Prepetition Lenders, former employees, officers, or

directors of the Debtors, and possibly others in connection with its above described investigation

of the liens and claims of, and against, the Prepetition Agent and Prepetition Lenders.[3]

25.     As detailed above in paragraphs 13-18, the Committee has conducted extensive

discovery with the cooperation of the Debtors and the Prepetition Agent, however, the

Committee is concerned, especially given the lack of response from certain individuals described

in paragraph 17 above, that this informal investigation process needs the authority and power of a

Rule 2004 examination behind it in order to enable the Committee to try to timely complete its

investigation.

26.     Accordingly, by this Motion the Committee seeks authorization to conduct the

examinations of the Debtors, Prepetition Lenders, Prepetition Agent, former employees, officers,

or board members of the Debtors, or other individuals or entities, if it deems them necessary, and

to compel examinations of persons, and/or the production of certain documents, by issuing

subpoenas *duces tecum* pursuant to Rule 45 of the Federal Rules of Civil Procedure, adopted in

its entirety by Rule 9016.

## IV.   IN THE ALTERNATIVE, COMMITTEE REQUESTS AUTHORITY TO BRING ADVERSARY PROCEEDING ON BEHALF OF DEBTORS' ESTATES

27.     In the event that the foregoing extension of the Challenge Period is not granted,

---

[3]     Pursuant to Bankruptcy Rule 2004(a), the Court may order the examination of "any entity." Fed.R.Bankr.P. 2004(a).  Such an examination may relate to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate . . . ." Fed.R.Bankr.P. 2004(b). (emphasis added).  Moreover, the Court may compel an entity to produce documents prior to its examination.  Bankruptcy Rule 2004(c) provides that the "attendance of an entity for examination and for the production of documents, whether the examination is to be conducted within or without the district in which the case is pending, may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial." Fed.R.Bankr.P. 2004(c).

then the Committee hereby requests authority to initiate an adversary proceeding on behalf of the

Debtors' estates against the Prepetition Agent and Prepetition Lenders instanter to determine the

priority, validity, and extent of their liens and claims and for other relief relating to or arising out

of those facts and issues described above in paragraph 18 (the "**Lenders Cause of Action**").

28.     It is well-established that a creditors' committee may initiate adversary

proceedings in the name of the debtor-in-possession after obtaining court approval.  See In re

Aluminum Mills Corp., 132 B.R. 869, 884-885 (Bankr.N.D.Ill. 1991)(court authorized the

creditors' committee to prosecute all fraudulent conveyance and preference claims on behalf of

the debtor and all creditors).  A bankruptcy estate's exclusive authority may vest in a creditors'

committee when: (a) the trustee unjustifiably refuses a demand to pursue the action; (b) the

creditor establishes a colorable claim or cause of action; and (c) the creditor seeks and obtains

leave from the bankruptcy court to prosecute the action for and in the name of the trustee.  In re

Perkins, 902 F. 2d 1254, 1258 (7th Cir. 1990).   A formal request to the debtor-in-possession to

pursue an action, however, is not required when it is clear that such request would be futile.  See

In re National Forge Co., 304 B.R. 214, 222 (Bankr.W.D.Pa. 2004)(committee's failure to first

request that debtor bring action was not required where some of the defendants in the fraudulent

transfer action were "key employees" of the debtor and the debtor itself voiced opposition to the

proceeding); In re First Capital Holdings Corp., 146 B.R. 7, 13 (Bankr.C.D.Cal. 1992)(committee

did not have to make a demand on the debtor to bring an action against the officers, directors and

a controlling shareholder of the debtor because such demand would have been futile).

29.     Here no demand upon the Debtors to bring the Lenders Cause of Action is

necessary because it would be futile since the Debtors have released the Prepetition Agent and

Prepetition Lenders under the terms of the Final DIP Order (para. F & 8(a) of Exh. A) and,

furthermore, the Committee is the only party who can bring the Lenders Cause of Action because

the Challenge Period has expired for all other parties in interest (para. 8(b) of Exh. A).[4]

30.   Accordingly, the Committee requests authority to bring the Lenders Cause of

Action on behalf of the Estates.

## V.   WAIVER OF HEARING ON OMNIBUS HEARING DATE

31.   In light of the relief requested herein concerning the extension of the Challenge

Period and in order to permit the Committee's investigation to proceed unheeded, the Committee

respectfully requests that this Motion be heard on March 7, 2007, rather than on the next

omnibus hearing date of March 20, 2007, set by the Case Management Procedures Order entered

on January 22, 2007 [docket no. 71].

WHEREFORE, the Committee requests that this Court enter an order in the form

attached hereto as exhibit C, and for such other and further relief as is just and proper.

Respectfully submitted,

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ENESCO GROUP, INC. ET AL.


By:   /s/ Brad A. Berish
CHAD H. GETTLEMAN, ESQ. (ARDC #944858)
HENRY B. MERENS, ESQ. (ARDC #6181695)
BRAD A. BERISH, ESQ (ARDC #06200891)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Boulevard, Suite 1050
Chicago, Illinois 60604

---

[4]   As a precaution, the Committee made a demand upon the Debtors on 3/2/07 to bring the Lenders Cause of Action and has received no reply to date. The Committee intends to bring the Complaint for the Lenders' Cause of Action to the hearing on the Motion and will be prepared to file same upon the approval of this request.

(312) 435-1050
chg@ag-ltd.com
hbm@ag-ltd.com
bab@ag-ltd.com